# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**JORGE SANTOS**

**CIVIL ACTION**

**VERSUS**

**NO. 18-1098-JWD-RLB**

**THE BATON ROUGE
WATER WORKS
COMPANY**

## RULING AND ORDER

This matter comes before the Court on the *Motion for Summary Judgment* (Doc. 12) filed by Defendant The Baton Rouge Water Works Company ("Defendant" or "BRWC"). Plaintiff Jorge Santos ("Plaintiff") opposes the motion. (Doc. 14.) Defendant has filed a reply. (Doc. 19.) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's motion is granted in part and denied in part.

## I.    Introduction and Summary

### A.  Overview

Plaintiff filed suit for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and Louisiana Employment Discrimination Law, La. R.S. 23:301 *et seq.* ("LEDL") claiming Defendant discriminated against him based on his national origin and accent and retaliated by harassing him, creating a hostile work environment, and then firing Plaintiff.

In the instant motion, Defendant moves to dismiss all of Plaintiff's claims. Having carefully considered the arguments, law, and evidence, the Court will grant the motion as it relates to Plaintiff's discrimination and retaliation claims because: (1) Plaintiff's Title VII claims for acts

occurring before November 2, 2017 are time barred; (2) Plaintiff's LEDL claims for acts occurring

before August 29, 2017 are time barred; (3) with respect to Plaintiff's non-time barred claims of

discrimination, (a) he has failed to produce competent summary judgment evidence to identify

comparators, and even assuming he made out a prima facie case, (b) he failed to rebut all of

Defendant's legitimate, non-discriminatory reasons for his termination.

The Court will deny the motion as to Plaintiff's Title VII and LEDL hostile work

environment claims. Defendant raised arguments related to these claims for the first time in its

reply memorandum.

The Court will also deny the motion on Plaintiff's non-prescribed retaliation claims related

to his 2018 suspension and termination because BRWC failed to substantively address them in its

original memorandum.

### B.  Violations of Local Rule 56

#### 1. Defendant's Statement of Material Facts

As an initial matter, the Court must determine the admissibility of Defendant's *Statement*

*of Material Facts Not at Issue* ("*SMF*") (Doc. 12-6), submitted in support of its motion. Plaintiff

argues that Defendant's *SMF* should be disregarded for failure to comply with Local Rules 56(b)

and (f). (Doc. 14 at 8.) Specifically, Plaintiff contends that because not one fact in BRWC's factual

statement is supported by a record citation, every one of its facts should be disregarded by the

Court and BRWC's motion should be denied. (*Id*.)

Although the Court "may disregard any statement of fact not supported by a specific

citation to record material properly considered on summary judgment [,]" the Court declines to do

so here. Local Civil Rule 56(f). The Court acknowledges that it has "no independent duty to search

or consider any part of the record not specifically referenced in the parties' separate statement of

facts." Local Civil Rule 56(f). However, case law recognizes that the Court may still consider record evidence to determine if there is a factual dispute. *See Smith v. Brenoettsy*, 158 F.3d 908, 910 (5th Cir. 1998) (holding, where plaintiff failed to oppose the motion for summary judgment, that facts in "Statement of Undisputed Facts" were admitted, "except to the extent that the 'facts' in the 'Statement of Undisputed Facts' are contradicted by 'facts' in other materials attached to his motion for summary judgment." (citation omitted)); *Tilson v. DISA, Inc.,* No. 17-240, 2019 WL 6878867, at *3 (M.D. La. Dec. 17, 2019), *aff'd*, 828 F. App'x 193 (5th Cir. 2020) ("Because Plaintiff has cited to record evidence that contradicts some of DISA's statements, the Court will consider those statements opposed."); *see also, Trahan v. Transamerica Life Ins. Co.,* No. 18-1085, 2020 WL 3196725, at *12 (M.D. La. June 15, 2020) (deGravelles, J.); *Braud v. Wal-Mart Stores, Inc.*, No. 17-320, 2019 WL 3364320, at *4 (M.D. La. July 25, 2019) (deGravelles, J.); *Porter v. Dauthier*, No. 14-41, 2015 WL 5611647, at *8, *13 (M.D. La. Sept. 23, 2015) (deGravelles, J.). The reason for doing so is even more justified here, given that in the factual section of its memorandum, BRWC uses the same facts from its *SMF*, but it provides record citations for each fact. BRWC also supplied record citations for each of its factual assertions contained in its *SMF* in its reply brief.

### 2. Plaintiff's Additional Statement of Facts in Dispute

Defendant also violated Local Rule 56(d), by not responding to Plaintiff's set of *Additional Undisputed Material Facts ("AUMF")*. (Doc. 14-1.) Local Rule 56(d) requires:

> A party replying to the opposition to a motion for summary judgment shall submit with its reply a separate, short, and concise statement of material facts which shall be limited to any additional facts submitted by the opposing party. The reply statement shall admit, deny or qualify such additional facts by reference to the numbered paragraphs of the opposing party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by subsection (f) of this rule. Each such reply statement shall begin with the designation

"Admitted," "Denied," or "Qualified" and, in the case of an admission, shall end with such designation.

Accordingly, for the same reasons discussed above, and to the extent that Plaintiff's *Additional Undisputed Material Facts* are unconverted by BRWC and the evidence, and are material, they are deemed admitted. The Court notes that while it has considered all of Plaintiff's *AUMF*, only those facts that are material are incorporated into this Ruling.

## II. Background

### A. Hiring

In October of 2009, Plaintiff, a native of El Salvador, was hired by BRWC as a "Utility Worker 1." (Santos Dec., Doc. 14-2 at ¶ 1.) Plaintiff was referred to BRWC to apply for employment by Hays Owen, who was then the Senior Vice President and Chief Administrative Officer. (*Statement of Material Facts Not at Issue* ("*SMF*") ¶ 1, Doc. 12-6; *Opposing Statement of Material Facts* ("*OSMF*") ¶ 1, Doc. 14-1.)[1]

The Utility Worker 1 position falls within the collective bargaining unit and is covered by the collective bargaining agreement between The Office and Professional Employees International Union, Local 428, AFL-CIO and BRWC. (*SMF* ¶ 5; *OSMF* ¶ 5.) Upon hiring, all new employees within the bargaining unit undergo a one hundred twenty (120) day probationary period, during which the new employee is not entitled to the protection of the provisions of the collective bargaining agreement. (*SMF* ¶ 6; *OSMF* ¶ 6.) This probationary period may be extended by mutual consent of the Union and BRWC. (*Id.*)

Generally, employees who are hired as a Utility Worker 1 are required to obtain a commercial driver's license ("CDL") prior to the expiration of their probationary period. (*SMF* ¶

---

[1] Generally, when both the *SMF* and *OSMF* are cited, the fact is undisputed, and the statement is taken almost verbatim from the *SMF*.

7; *OSMF* ¶ 7.) BRWC asserts that if an employee "fail[s] to obtain this license before the end of the probationary period, they are terminated." (Mire Dec., Doc. 12-5 at ¶ 8.) However, Plaintiff denies this assertion and points out that despite not obtaining the required CDL, he remained classified internally as a Utility Worker 1 and he was not fired. (Mire Dep., Doc. 17-2 at 41, 168; Santos Dec., Doc. 14-2 at ¶ 27.) Instead, his probationary period was extended with the consent of the Union. (*SMF* ¶ 9; *OSMF* ¶ 9.)

### B. Probation

Plaintiff claims the extension of his probationary period was "really related to discrimination against [him]" because of his national origin and accent. (Santos Dec., Doc. 14-2 at ¶ 25.) In contrast, BRWC argues that his probationary period was extended due to "his unsatisfactory performance in the Operations Department." (Mire Dec., Doc. 12-5 at ¶¶ 10, 11.)

BRWC points to the following January 19, 2010 email written by Trey Argrave (Plaintiff's supervisor at the time) to Owen, to support this assertion:

> FYI
>
> As you know, I had Gary and Travis have [sic] a talk with Jorge' a couple of weeks ago. They had a couple of days of improvement, but it looks like he is regressing. Last week he was reminded that he was scheduled to take his driving test on Sat. He told Travis (foreman) that he was scheduled to work on Sat. and could not take the test. We told him that he was working for us and we would get someone to fill in on the Sat. crew. He then told Travis that he was not prepared for the test. Travis volunteered to help him work on his driving after work throughout the week. After lunch on Wed. Greg M. received a phone call from Natlalie [sic] asking us to cancel Jorge's Sat. Test date. Jorge had called Betty and told her he could not take the test after Travis' conversation with him. He was trying to pull one. We have put him on several maintenance trucks the last couple of weeks and we are getting the same complaints from the #III men. As long as a foreman is on the job he works, but as soon as the crew is alone they get very little out of him. As late as yesterday he would not even put his boots on to help Von Keith Estelle. He still has a very limited knowledge of the fittings and supplies even though several maint[enance] people have taken the extra time to help him along. I do not see the situation improving and would like to cut our losses. Let me know what you think.

Thanks
Trey

(Doc. 15-8 at 9, BRWC_00844.)

Plaintiff objects to the admissibility of this email. Plaintiff argues that this email should be given no weight because Argrave is one of the individuals who discriminating against him. (Santos Dec., Doc. 14-2 at ¶¶ 4–9, 21–24.) Additionally, the "self-serving email" was produced after Argrave's deposition and after the close of discovery. (*OSMF* ¶ 10.) Plaintiff states: "the fact that an adequate search was not performed in the first instance with respect to [Plaintiff]'s document requests should result in the email being given an adverse inference." (*Id*.) Since the Court's Ruling does not rest on this email, the Court declines to resolve the issues of its admissibility.

Adrienne Mire, Director of Human Resources, also reported that Plaintiff was going to be dismissed as an "unsatisfactory probationary" employee. (Mire Dec., Doc. 12-5 at ¶ 12; *SMF* ¶ 11.)[2]  Mire reported this to Owen (her supervisor) because he was the one who had initially put Plaintiff up to be hired. (*Id*.)

### C.  Job Change

On January 20, 2010, Plaintiff was moved to the Meter Reader Department under the supervision of Brent Pourciau and given the job title of "Meter Changer." (*SMF* ¶ 13; *AUMF* ¶ 1.)

According to Plaintiff, the Meter Changer position: (1) did not exist before he was given the title (Santos Dec., Doc. 14-2 at ¶ 8; *AUMF* ¶ 2); (2) was created specifically for him (Santos Dec., ¶ 8; *AUMF* ¶ 3); (3) was not listed in BRWC's Union handbook (*AUMF* ¶ 4); (4) had no

---

[2] Plaintiff's response is qualified as he "has no knowledge of this fact." (*OSMF* ¶ 11.) However, Plaintiff's knowledge of this fact is irrelevant. Therefore, this fact is deemed admitted.  Further, to the extent it is relevant, Adrienne Mire was the Director of Human Resources throughout Plaintiff's employment. (*SMF* ¶ 3; *OSMF* ¶ 3.)  She is now the Vice President of Administration for BRWC. (*Id*.)

promotional potential (Santos Dec., ¶¶ 8, 11, 16, 19, 20; *AUMF* ¶ 6); and (5) was not held by any other BRWC employee (Santos Dec., ¶ 14; *AUMF* ¶ 8).

BRWC asserts that, "despite the fact that the Meter Changer position held by Santos did not require [him] to have a CDL, Baton Rouge Water continued to attempt to assist Santos in his efforts to obtain the CDL, as had been previously scheduled/planned." (Mire Dec., Doc. 12-5 at ¶ 15.)

Plaintiff denies this assertion. He points to the email below, showing that he was scheduled to take the CDL test, but argues that he was never informed of the test for discriminatory reasons. (Santos Dec., Doc. 14-2 at ¶¶ 30–31.) The email provides:

BRWC_Supplemental Response to RPD Nos. 3 and 5

**Trey Argrave**

| From: | Greg Mancuso |
| --- | --- |
| Sent: | Monday, January 18, 2010 7:32 AM |
| To: | Whitney Franklin; Travis Harrison; Kevin McCauley; Lee Bozeman |
| Cc: | Trey Argrave; Don Kozan; Steve Eccles; Natalie Diez; Dawn Brown |
| Subject: | 3 CDL test on 1-23-10 and 1 CDL test on 1-30-10 |

Please let these 3 men know that they will take the CDL driving test Saturday, Jan.23 in Livingston at the school board office parking lot. Please make sure that their DMV permits have not expired, watch video, practice driving, and have arranged for someone to take them. The current test times scheduled are listed below. --- Also, let Gus Diez know that he will test at the same place on Saturday, Jan.30, at 1:00 PM.

1) Jeffery McCauley at 8:30 A.M. on 1-23-10
2) Chad Phelps at 2:00 PM on 1-23-10
3) Jorge Santos at 3:30 PM on 1-23-10

(Doc. 14-2 at 9, BRWC_00843.)

Plaintiff further states that he obtained his CDL-C at his own expense and without BRWC's assistance because Mire would not allow him to use a company vehicle to upgrade his CDL-C to a CDL-A (the required license to be a Utility Worker 1). (Santos Dec., Doc. 14-2 at ¶¶ 34–35; *AUMF* ¶ 10.)

Both parties agree that in 2010, BRWC stopped being involved in obtaining a CDL license for Plaintiff. (*SMF* ¶ 15; *OSMF* ¶ 15.) However, the reason behind this decision is disputed. BRWC contends that it stopped assisting Plaintiff because such license was not required for his job and/or the Meter Reader Department, where he was employed. (Mire Dec., Doc. 12-5 at ¶ 16.) Plaintiff, on the other hand, contends that BRWC stop assisting him for discriminatory reasons because of his national origin and accent. (Santos Dec., Doc. 14-2 at ¶ 26.)  According to Plaintiff, BRWC knew that if Plaintiff did not have the required CDL, it could claim he was not qualified to be a Utility Worker 1. (*Id.* at ¶¶ 28–32.) Specifically, Plaintiff declares: "By not assisting me in obtaining my CDL, I believe BRWC knew that I could be terminated as Utility Worker 1 and I also could not be promoted and attain the title of Utility Worker 2." (*Id.* at ¶ 33.)

Due to the collective bargaining agreement, and for payroll purposes, Plaintiff remained classified as a "Utility Worker 1" even though he did not possess the required CDL license to be a Utility Worker at BRWC. (Mire Dec., Doc. 12-5 at ¶ 13; Mire Dep., Doc. 17-1 at 56–57, 62–63, 170–171; *SMF* ¶ 13.)[3] To the best of Mire's knowledge, Plaintiff never obtained the required CDL license during his employment with BRWC. (*SMF* ¶ 8; *OSMF* ¶ 8.)

By all accounts, Plaintiff remained in the same position of Meter Changer from 2010 to his termination in 2018. (Mire Dep., Doc. 17-1 at 74; Santos Dec., Doc. 14-2 at ¶ 17; *AUMF* ¶ 7.)

### D. Reprimand

On May 14, 2015, Plaintiff received a reprimand. (*SMF* ¶ 18; *OSMF* ¶ 18.) The reason for the reprimand is disputed.

---

[3] Plaintiff denies this fact as he "was unaware that he was still classified as Utility Worker 1." (*OSMF* ¶ 13; Santos Dec., Doc. 14-2 at ¶ 10.) However, Plaintiff's knowledge of this fact is irrelevant. Therefore, this fact is deemed admitted.

Defendant argues that Plaintiff was disciplined due to "his insubordinate behavior toward a supervisor." (Mire Dec., Doc. 12-5 at ¶ 19.)  In support of this, Defendant points to the written documentation of his reprimand in his personnel folder. This document provides:

> You have been counseled on several occasions regarding your behavior toward a supervisor, specifically not listening to direction of a supervisor and arguing.
>
> On May 6, 2015, a supervisor directed you to change a process on a particular meter installation. You stated to the supervisor that you did not believe that he had the authority to direct your work and walked away.
>
> The company must be able to rely on its employees to maintain an appropriate level of responsibility in following directions and communicating with management.
>
> Be advised that any reoccurrence of this or similar actions, will result in further disciplinary action, up to and including suspension without pay or termination of employment.

(Doc. 12-3 at 99–101.)

On the other hand, Plaintiff denies that he was reprimanded for insubordinate behavior toward a supervisor. Instead, he contends that the behavior involved a non-supervisor (Tim Andrews) and that the reprimand was due to discriminatory reasons. (Santos Dec., Doc. 14-2 at ¶ 37 (declaring that he "informed [] Mire that my behavior was not insubordinate but instead I was being discriminated against because of my national origin.").)

Both parties agree that this reprimand, which occurred on May 14, 2015, was the most recent disciplinary action prior to Plaintiff's July 2018 suspension and termination. (*SMF* ¶ 18; *OSMF* ¶ 18.)

### E.  Accident and Suspension

On Friday, July 13, 2018, Plaintiff was allegedly involved in a work-related accident. On Tuesday, July 17, 2018, Plaintiff was suspended due to the accident.

### 1. Defendant's Version of Events

Mire testified that she first learned of Plaintiff's accident on Tuesday, July 17, 2018, when Pourciau, the manager of the Meter Reading Department, called her and informed her that Plaintiff failed to report an accident that he was involved in to his supervisor. (Mire Dep., Doc. 12-2 at 77–78.)

Mire's understanding of what actually transpired from July 13 to July 17 with respect to Plaintiff's accident was that he backed into a gate on the afternoon of Friday, July 13, 2018 at around 4 p.m. and then brought his company vehicle to "to one of the fleet mechanics and asked him to fix the taillight." (Mire Dep., Doc. 12-2 at 81.) According to Mire, Plaintiff also asked the fleet mechanic if he had to tell Steve Eccles [the fleet manager], to which the fleet mechanic replied "yes." (*Id.*) At some point before Tuesday, July 17, Eccles [the fleet manager] went to Pourciau and asked him when would be a good time to fix the damaged company vehicle because "that means they're down a vehicle when he has to fix them." (Mire Dep., Doc. 12-2 at 82.) Pourciau then asked Ecceles what he vehicle he was talking about, to which Eccles explained what happened. Mire testified that Pourciau then got with Chad Wilkinson [a supervisor], to see if he knew about the accident or the damage to the company vehicle. Wilkinson said he "didn't know anything about it." At that point, they contacted Plaintiff to talk to him about it. (*Id.*) Mire said she learned the above information through Pourciau when he called her to explain what happened and began talking about the next steps. (Mire Dep., Doc. 12-2 at 82–83.)

On Tuesday, July 17, 2018, Plaintiff was suspended. The documents in his personnel folder explain:

> On Tuesday, July 17, 2018, it was discovered that you were involved in a vehicle accident in a company vehicle on Friday, July 13, 2018.
>
> Be advised that you are being suspended without pay until further notice and until an investigation of the events that occurred is completed and a determination of your employment status can be made.

(Doc. 12-3 at 61.)

As to Plaintiff's suspension, Mire testified that they "felt like he was not going to change what he was doing and it was a liability on the company for somebody to be out there and not understand or agree really more than anything that he should contact his supervisor as soon as any accident happens, especially one that is involving property of somebody else, whether it be a vehicle or whether it be a gate, so that we can go out and rectify the situation and make sure we know what's all going on." (Mire Dep., Doc. 12-2 at 79.)

Mire further testified that Plaintiff was suspended while they debated on whether to terminate him or not. (Mire Dep., Doc. 12-2 at 79–80.) She stated that they were trying to figure out how they could keep him. (*Id*.) According to Mire, the hope was that Plaintiff would admit his wrongdoing, apologize, and take responsibility for his actions, but instead they got, "I don't understand why you think I did anything wrong. I didn't do anything wrong. The gate wasn't damaged. All I did was break a taillight." (Mire Dep., Doc. 12-2 at 80.) Plaintiff's response created a "huge concern" that this behavior would continue in the future. (*Id*.)

### 2. Plaintiff's Version of Events

According to Plaintiff, on July 13, 2018, he inadvertently broke the taillight on his company vehicle while backing out of a customer's driveway. (Santos Dec., Doc. 14-2 at ¶ 40.) The company vehicle that Plaintiff he was driving at the time of the accident was not his usual or assigned company vehicle. (Santos Dec., ¶ 55; *AUMF* ¶ 17.)

Plaintiff explains the timeline of events as follows:

After I backed into the customer's gate, I inspected the customer's property and did not observe any damage.

11

> When I returned to the shop at the end of the day, I immediately took my vehicle to the maintenance department and reported the incident and the damage to my company vehicle to the fleet mechanic (William O'Neill).
>
> Mr. O'Neill informed the fleet supervisor (Steve Eccles). Mr. Eccles took pictures of the truck and informed me that the taillight would be fixed.

(Santos Dec., ¶¶ 44–47; *AUMF* ¶ 16.)

Prior to his suspension, Plaintiff "was not given an opportunity to tell his version of events to HR." (Santos Dec., Doc. 14-2 at ¶ 58.) Further, "[d]uring the course of the investigation, a statement was never taken from me nor was I provided the opportunity to speak to HR about the incident and my explanation." (*Id.* at ¶ 59.) He also was not afforded the opportunity to speak with Mire regarding his suspension or possible termination. (*Id.* at ¶ 64; *AUMF* ¶ 30.)

## F. Termination

On July 20, 2018, Plaintiff's employment with BRWC was terminated. The facts surrounding Plaintiff's termination are heavily disputed.

### 1. Defendant's Version of Events

According to BRWC, Plaintiff was terminated due to: (1) his failure to report the damage to a company vehicle to his supervisor, (2) his denial of damage to the customer's gate, (3) his refusal to admit that he had done anything wrong, and (4) his indication that he would not do anything differently if it happened again. (Mire Dec., Doc. 12-5 at ¶ 20; Mire Dep., Doc. 12-2 at 77–86; Doc. 12-3 at 62–63, 95–96.)

To support this assertion, Defendant points to Mire's deposition, in which she testified:

Q.    What led- - what incident led to Mr. Santos ultimately being terminated from employment?

A.    It stemmed from an accident that he had but ultimately the termination was that he disagreed that he had done anything wrong and that he would change his behavior in the future.

(Mire Dep., Doc. 12-2 at 77.)

Defendant also relies on Mire's declaration in which she declares, "[w]hen interviewed, [Plaintiff] denied that there was any damage to the Customer's gate, he denied that he had failed to report the incident to his supervisor (as required by Company policy), he denied that he had done anything wrong and indicated that he wouldn't do anything differently (as required by Company policy) in the future." (Mire Dec., Doc. 12-5 at ¶ 20.)

Plaintiff's termination documents provide:

On Tuesday, July 17, 2018, the Fleet Manager gave an update to your department head concerning one of the meter department vehicle's damage, about which your supervisor had no knowledge. It was determined that on Friday, July 13, 2018, you had hit a customer's gate, damaging it and the company vehicle. However, you did not contact your supervisor, the customer, or the police to report the incident. After you finished your work day, you brought the vehicle to a company mechanic to ask that he repair the tail light, even though the damage was significantly more than the tail light.

Despite having your supervisor's contact information that you had used many times before, and against company policy, you never notified your supervisor at the time of the accident and through the following Tuesday. This caused the company not to be able to contact the customer to repair the damage, obtain information needed to determine the extent of the company's liability, or to take a timely post-accident drug test.

When you were asked about the incident by your supervisor on Tuesday, you stated that there was no damage to the customer's property. You remained steadfast in your disagreement that there should be concerns with your actions during discussions with your supervisor and manager regarding the incident.

It is imperative that the company by able to trust its employees to appreciate the seriousness of an accident and the importance of reporting accidents to their supervisor timely, especially those involving damage to property. Further, it was determined that you provided false or misleading information during the investigation. Your actions are considered unacceptable and cannot be tolerated.

Be advised that your employment is terminated.

(Doc. 12-3 at 62–63, 95–96.)

Based upon this, Plaintiff's direct supervisor (Chad Wilkerson), the department head (Brent Pourciau), and Mire decided to terminate Plaintiff's employment, after obtaining Owen's approval. (Mire Dec., Doc. 12-5 at ¶ 21.)

### 2. Plaintiff's Version of Events

In contrast, Plaintiff argues he was fired based on his national origin and accent, not for any violation of company policy. Plaintiff points to out that BRWC's company policy did not require him to report the incident to his supervisor. At the time Plaintiff was hired, BRWC's Vehicle Policy stated that, "[in] the event of an *accident with another vehicle*, employees are expected to follow these steps: […]

- Notify your supervisor and the Human Resources Department about the accident as soon as possible.

(Doc. 12-3 at 51–52.)

In Mire's deposition, she agreed that Plaintiff did not get into an accident with another vehicle. (Mire Dep., Doc. 17-1 at 132; *AUMF* ¶ 27.) Plaintiff reasons that since he did not get into an accident with another vehicle, he was not required by company policy to report the accident to his supervisor. (*AUMF* ¶ 26.) Further Plaintiff was never provided with the company policy that he allegedly violated nor did BRWC provide any evidence that he received the policy. (Santos Dec., Doc. 14-2 at ¶ 56; Mire Dep., Doc. 17-1 at 129–131; *AUMF* ¶ 25.)

Plaintiff also relies on his declaration as evidence to show that he did report the damage he caused to the company vehicle and that he was unaware of any damage caused to the customer's property. (Santos Dec., ¶¶ 44, 46–47; *AUMF* ¶¶ 28–29.)

He declares that he has never been provided pictures that Eccles took of the damage to his truck when Eccles first inspected the truck. (Santos Dec., Doc. 14-2 at ¶ 50; *AUMF* ¶ 24.) Further,

14

the pictures Pourciau took show additional damage to the vehicle that "was not present when [he] brought [his] vehicle to the maintenance area on July 13, 2018." (Santos Dec., ¶ 52.)

> Plaintiff declares:
>
> I believe the additional damage may have been created by BRWC to make the July 13, 2018 incident appear more serious than it actually was and as a justification for my termination.
>
> I do not believe that the damage reflected in the pictures taken by Mr. Pourciau corresponds to the damage that you would expect to be caused by a truck backing into the customer's metal gate, based on, among other things, height and orientation of the truck and gate.

(*Id*. at ¶¶ 53–54.)

Plaintiff believes that the actions taken by BRWC were "incommensurate to the incident" as he never once received a traffic citation or speeding ticket during his employment. (Santos Dec., ¶ 60.) He notes that no other BRWC employee has been terminated for a similar incident. (Santos Dec., ¶ 43.) He cites to Mire's deposition in support of this. However, while Mire testified that Plaintiff was "most likely" the first employee to be terminated after hitting property, she clarified that Plaintiff was not terminated for hitting the gate. (Mire Dep., Doc. 17-1 at 116.)

As additional evidence, Plaintiff refers to the fact that the Administrative Law Judge granted his appeal of his disqualification from unemployment insurance benefits on the grounds that BRWC failed to provide evidence that he did not follow company policy and that there was doubt concerning the incident that led to his termination. (Santos Dec., Doc. 14-2 at ¶ 66.)

Finally, Plaintiff contends that Pourciau made the decision to terminate him. (Mire Dep., Doc. 17-1 at 91; *AUMF* ¶ 31.)  Plaintiff argues that because Owen was out of town, he was not involved in the decision to terminate Plaintiff, but instead Patrick Kerr approved his termination. (Santos Dec., ¶ 62; Mire Dep., Doc. 17-1 at 95; *AUMF* ¶¶ 32–33.)

### G.  The Union

Under the collective bargaining agreement, the Union had the right to grieve discipline (as defined in the Agreement) received by Plaintiff during his employment and to seek arbitration if the Union believed that BRWC's discipline, including Plaintiff's termination on July 20, 2018, was not based upon 'just cause.' " (Mire Dec., Doc. 12-5 at ¶ 17; *SMF* ¶ 16.)[4]  It is undisputed that the Union never requested arbitration with respect to, nor arbitrated, any discipline received by Plaintiff, including the termination of his employment in 2018. (*SMF* ¶ 17; *OSMF* ¶ 17.)

### H.  Plaintiff's Other Evidence of Discrimination

In his Declaration, Plaintiff cites to several occurrences and comments to support his discrimination, retaliation, and hostile work environment claims.

#### 1. Argrave

In late 2009 or early 2010, Plaintiff alleges that one of his supervisors, Argrave, ridiculed, insulted, and humiliated him in front of his co-workers telling Plaintiff that "no wanted to work with [him], that [he] did not want to work, and that [he] was lazy." (Santos Dec., Doc. 14-2 at ¶ 4.)  Plaintiff declares: "In response, I asked Mr. Argrave to allow me to work alone or to be transferred to another supervisor. Mr. Argrave refused. Immediately after this, a number of BRWC employees said they wanted to test my English and tested me on various parts and ridiculed and insulted me." (Santos Dec., ¶ 5.) On that same day, Plaintiff reported this conduct to Owen. (*Id*. at ¶ 6.) As a result, Plaintiff believes he was retaliated against by being put in the position of Meter Changer, a position that had not previously existed, was specifically created for him, and had no promotional potential. (*Id*. at ¶¶ 7–8.)

---

[4] Plaintiff's response is qualified as Plaintiff says he "was unaware of this fact." (*OSMF* ¶ 16; Santos Dec., Doc. 14-1 at ¶ 63.) Plaintiff's awareness of this fact is irrelevant. Therefore, this fact is admitted.

Argrave would restrict Plaintiff's access to certain work areas, maintenance areas, and amenities in or around 2014 because of his national origin and accent. (Santos Dec., ¶ 23.) Argrave also instructed or approved the refusal of the main dispatcher, Jude Quebedeaux, to take his calls. (Santos Dec., Doc. 14-2 at ¶ 21.) According to Plaintiff, Quebedeaux would tell Plaintiff that he could not speak English and he could not understand Plaintiff because of his accent. (*Id.*) When Argrave was asked at his deposition about Santos's ability to speak English, he stated:

> A.    I would not say from my memory that he has a complete-- I don't know the word to use. … I mean, I think he can communicate and make himself known but-- you know, I really don't understand the exact question you're asking.
>
> Q.    That answer is fine. But the question is do you think he can speak English?
>
> A.    Yes, yes. Simply if that's the simplest form of the question, …

(Argrave Dep., Doc. 12-4 at 33; *id.* (testifying that he didn't remember if Plaintiff had an accent or not).)

### 2. Pourciau

Pourciau was Plaintiff's supervisor once he became a Meter Changer in 2010 until his termination in 2018. As to Pourciau, Plaintiff declares that when he asked about applying for a Meter Reader position, Pourciau told him he could not apply. (Santos Dec., ¶ 20; Santos Dep., Doc. 16-2 at 38–39; *AUMF* ¶ 9.)   Plaintiff also claims that when he complained about the discrimination and harassment he was facing, "Pourciau not only failed to address his complaints but instructed Mr. Santos not to complain any more about the conduct he had reported." (Santos Dec., ¶ 38.)

### 3. Mire

Mire was the director of Human Resources throughout Plaintiff's employment with BRWC. (*SMF* ¶ 3; *OSMF* ¶ 3.) As to her, Plaintiff claims she never investigated any complaints

made by him, whether made directly to her or which she learned of through other BRWC employees. (Mire Dep., Doc. 17-1 at 162–165; Santos Dec., Doc. 14-1 at ¶¶ 36–37, 39; *AUMF* ¶ 12.)  Additionally, Plaintiff points out that BRWC has no written policies with respect to discrimination, harassment, retaliation, and investigation of employee complaints. (BRWC Dep., Doc. 16-1 at 13; *AUMF* ¶ 34.)

## I.   **Defendant's Other Evidence of No Discrimination**

At all times during Plaintiff's employment, Mire was personally aware that he was from El Salvador. (Mire Dec., Doc. 12-5 at ¶ 22.) Mire declares: "This fact had no bearing whatsoever on [BRWC]'s decision to hire [Plaintiff], to extend his probationary period (in order to give him a chance to successfully complete it), to transfer him to a different department as an alternative to termination (so that he could continue as an employee for eight more years) or its ultimate decision to terminate [Plaintiff's] employment." (*Id*.)

Additionally, BRWC presently has two other employees from El Salvador working in the Operations Department, Elmer Alvarez and Santos Flores. (Mire Dec., ¶ 23; Argrave Dep., Doc. 12-4 at 57–59.)[5] Both were hired in 2013 as Utility Worker 1(s), both successfully completed the probationary period and obtained their CDL license, as required (with BRWC's assistance), and both have been subsequently promoted by BRWC. (*Id*.) Elmer Alvarez has been promoted twice, and he is now a Utility Worker 3. (*Id*.) Santos Flores has been promoted once to Utility Worker 2. (*Id*.)

## III.   **Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[5] Plaintiff's response is qualified as Plaintiff says he "was unaware of this fact." (*OSMF* ¶ 22.) Plaintiff's awareness of this fact is irrelevant. Therefore, this fact is admitted.

Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .   [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S. Ct. 1348 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

## IV.   Discussion

### A.  Defendant's Failure to Properly Brief Certain Claims

Initially, the Court will address Plaintiff's argument that Defendant's failure to substantively address his retaliation and hostile work environment claims makes summary judgment inappropriate.

Plaintiff argues that BRWC only "causally references" his retaliation and hostile work environment claims and fails to adequately brief them. (Doc. 14 at 11.) In support of this, Plaintiff points to the introduction section of BRWC's memorandum, which alleges:

> The plaintiff, Jorge Santos, has made claims, and filed this suit, against BRWC for national origin discrimination, harassment (based upon national origin) and retaliation (for complaining about discrimination and harassment, based upon

national origin) under Title VII and La. R.S. 23:301 et seq. BRWC submits that the bulk of Mr. Santos' complaint and claims based upon events alleged therein (except for the claim based upon his termination by BRWC on July 20, 2018), are prescribed. Additionally, BRWC submits that Mr. Santos is unable to make a prima facie showing (of discrimination, harassment and/or retaliation based upon his national origin) or bear his ultimate burden of proving discrimination, harassment or retaliation (based upon national origin). Accordingly, BRWC is entitled to Summary Judgment, as a matter of law.

(Doc. 12-7 at 1.)

According to Plaintiff, besides this general statement, BRWC fails to substantively address his claims. (Doc. 14 at 11.) As to his retaliation claims, Plaintiff argues "BRWC entirely ignores that establishing a prima facie case of retaliation involves an entirely different showing than discrimination." (*Id*.) As to his hostile work environment claims, Plaintiff avers "Just as BRWC did with Mr. Santos's retaliation claims, BRWC again fails to recognize or address that harassment involves a wholly different showing than discrimination." (*Id*. at 12.) Thus, BRWC is not entitled to summary judgment on these claims.

As to Plaintiff's hostile work environment claims, the Court agrees with Plaintiff. As to Plaintiff's retaliation claims, Defendant did address them as to prescription in its original memorandum, although it did not substantively address the merits. (*See* Doc. 12-7 at 12.) Accordingly, the Court will address whether Plaintiff's retaliation claims have prescribed but will not address the merits of them.

In sum, due to BRWC's failure to substantively address these claims in its original memorandum outside of its general statements that Plaintiff has failed to meet his burden of proving a prima facie case, summary judgment is not appropriate.[6] Therefore, Defendant's motion

---

[6] Courts in the Fifth Circuit have determined that new arguments raised for the first time in a reply brief need not be considered. *See, e.g.*, *Eitzen Bulk A/S v. Capex Indus., Ltd.*, No. 10-395, 2010 WL 5141257, at *3 (E.D. La. Dec. 13, 2010) (determining that the Court would not consider new arguments regarding the res judicata effect of a prior action because they were raised for the first time in a reply brief); *Cooper v. Faith Shipping*, No. 06-892, 2008 WL 5082890, at *4 (E.D. La. Nov. 25, 2008) (declining to consider new arguments presented for the first time in a reply brief "long

for summary judgment on Plaintiff's Title VII and LEDL hostile work environment claims is denied. Additionally, to the extent that Plaintiff's retaliation claims survive prescription, summary judgment on them is also denied. However, the Court will permit Defendant to file another motion for summary judgment addressing these claims.

### B.  Prescription

#### 1. Law

##### a.   Under Title VII

Under Title VII, a plaintiff must file an EEOC charge within 300 days from the date the unlawful employment practice complained about occurred. 42 U.S.C. § 2000e-5(e)(1); *see also, Taylor v. United Parcel Serv., Inc.,* 554 F.3d 510, 521 (5th Cir. 2008).  "Filing a timely charge is a prerequisite to having an actionable claim." *Stewart v. Mississippi Transp. Com'n*, 586 F.3d 321, 328 (5th Cir. 2009). Thus, any claims arising more than 300 days prior to the filing of an EEOC charge are time-barred. 42 U.S.C. § 2000e–5(e)(1).

##### b.   Under LEDL

Similarly, the LEDL has a one-year prescriptive period. La. R.S. 23:303(D); *Bellow v. Bd. of Sup'rs of Louisiana State Univ. & Agr. & Mech. Coll.*, 913 F. Supp. 2d 279, 289 (E.D. La. 2012), *aff'd in part sub nom. Bellow v. LeBlanc*, 550 F. App'x 181 (5th Cir. 2013); *Nabors*, 2012 WL 2457694, at *3 (citing La. R.S. 23:303(D)).  This period "begins to run on the date that the discrimination occurs." *Nabors*, 2012 WL 2457694, at *3; *see also Bellow*, 913 F. Supp. at 289 ("Prescription under the statute commences on the day that the termination occurred.").  "[T]his

---

after" the initial motion was filed). *See also Benefit Recovery, Inc. v. Donelon*, 521 F.3d 326, 329 (5th Cir. 2008) ("[A]rguments cannot be raised for the first time in a reply brief."); *Elwakin v. Target Media Partners Operating Co. LLC*, 901 F. Supp. 2d 730, 745–46 (E.D. La. 2012) ("Courts in the Fifth Circuit have found that a court need not consider new arguments raised for the first time in a summary judgment reply brief."); *Murillo v. Coryell Cty. Tradesmen, LLC,* No. 15-3641, 2017 WL 1155166, at *3 (E.D. La. Mar. 28, 2017).

one-year period shall be suspended during the pendency of any administrative review or investigation of the claim conducted by the federal Equal Employment Opportunity Commission or the Louisiana Commission on Human Rights." La. R.S. 23:303(D). "No suspension authorized pursuant to this Subsection of this one-year prescriptive period shall last longer than six months." *Id.* "Therefore, the total amount of time that a plaintiff has to bring a claim under Louisiana Revised Statute 23:322 is eighteen months." *Bellow*, 913 F. Supp. 2d at 289; *see also Nabors*, 2012 WL 2457694, at *3 ("Consequently, the LEDL requires a plaintiff to file suit on his discrimination claim no later than eighteen months after the occurrence forming the basis for the claim." (citations omitted)).

### c. Continuing Violation Doctrine

Under the continuing violation doctrine, a plaintiff is relieved of establishing that all of the complained of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period. *Henson v. Bell Helicopter Textron, Inc.*, 128 F. App'x 387, 391 (5th Cir. 2005) (per curiam) (citing *Felton v. Polles*, 315 F.3d 470, 487 (5th Cir. 2002)). "The Supreme Court has clarified, however, that discrete discriminatory acts are not actionable if time barred, even when they are related to acts complained of in timely filed charges." *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)).

"Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify," and each of these discriminatory or retaliatory incidents is "a separate actionable 'unlawful employment practice.' " *Id.* at 114. "A discrete retaliatory or discriminatory act 'occur[s]' on the day that it 'happen[s].' " *Id.* at 110. "[T]he limitations period begins on the

date of the alleged unlawful employment action." *Phillips v. Leggett & Platt, Inc.*, 658 F.3d 452,

455 (5th Cir. 2011).

> Further, as the Eastern District has explained:
>
> There are several limits on the applicability of the continuing violations doctrine, including
>
> (1) the plaintiff must demonstrate that the separate acts are related; (2) the violation must be continuing; intervening action by the employer, among other things, will sever the acts that preceded it from those subsequent to it; and (3) the doctrine may be tempered by the court's equitable powers, which must be exercised to "honor Title VII's remedial purpose without negating the particular purpose of the filing requirement."

*Notariano v. Tangipahoa Par. Sch. Bd.*, 266 F. Supp. 3d 919, 924 (E.D. La. 2017), *reconsideration*

*denied*, No. 16-17832, 2018 WL 1172959 (E.D. La. Mar. 6, 2018) (quoting *Heath v. Bd. of Sup'rs*

*for the Southern Univ.*, 850 F.3d 731, 738 (5th Cir. 2017), *as revised* (Mar. 13, 2017)).

> Moreover, as this Court has explained:
>
> This 'doctrine does not automatically attach in hostile work environment cases, and the burden remains on the employee to demonstrate an organized scheme led to and included the present violation.' *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 351 (5th Cir. 2001) (citing *Messer v. Meno*, 130 F.3d 130, 135 (5th Cir. 1997)) (emphasis added). Further, the doctrine 'requires the same type of discriminatory acts to occur both inside and outside the limitations period,' such that a valid connection exists between them. *Id.* (quoting *Martineau v. ARCO Chem. Co.*, 203 F.3d 904, 913 (5th Cir. 2000)).

*Price v. PCS Nitrogen Fertilizer, L.P.*, No. 03-153, 2010 WL 1005181, at *4 (M.D. La. Mar. 15,

2010).

"Discrete adverse actions, although racially motivated, cannot be lumped together with the

day-to-day pattern of racial harassment and therefore, if otherwise untimely, cannot be saved by

the continuing violation doctrine." *Boyd v. Trinity Industries, Inc.*, No. 14-469, 2015 WL 3969464,

at *2 (M.D. La. June 30, 2015) (citing *Mayes v. Office Depot, Inc.*, 292 F. Supp. 2d 878, 888 (W.D.

La. 2003)); *see also Pegram*, 361 F.3d at 280.

### 2. Parties Arguments

#### a. Defendant's Memorandum

Defendant argues that all of Plaintiff's Title VII claims that are based on events that occurred more than 300 days before August 29, 2018 (when Plaintiff filed his EEOC charge) are prescribed. (Doc. 12-7 at 11.) It also contends that based on La. R.S. 23:303(D), any of Plaintiff's LEDL claims that occurred prior to November 2017 are prescribed. (*Id*. at 12.)

Defendant avers:

> Plaintiff's complaint is "light" on specificity with respect to the dates of alleged discrimination and retaliation against him. The most recent specific date alleged, prior to his termination on July 20, 2018, was "October 17, 2016" (Complaint, par. 24), nearly two years prior to filing his EEOC Charge, and some two years and two months prior to filing his Complaint herein. The only event occurring within the 300 days prior to August 29, 2018 (Title VII claims) or November 2017 (claims under La. R.S. 23:301) was Plaintiff's termination on July 20, 2018.

(*Id*.)

#### b. Plaintiff's Opposition

In opposition, Plaintiff argues that none of his claims have prescribed. (Doc. 14 at 17.) First, he points out that BRWC fails to address the continuing nature of the violations alleged in his Complaint. (*Id*.) Plaintiff notes: "the very nature of the discrimination, harassment, and retaliation—relegation to a position with no promotion potential—was a manifestation of a continued violation culminating with termination for a reason that was pretext for discrimination." (*Id*.)

Next, Plaintiff argues that his retaliation claims have not prescribed because BRWC's decision to change his job to Meter Changer was not a discrete act but was a continuing violation comparable to repeated failures to promote. (*Id*. at 18.) Alternatively, Plaintiff's termination was the culmination of a series of continuing violations with respect his placement into as position with

no promotion potential. (*Id*. at 19.) Either way, the continuing violation doctrine applies, and his retaliation claims are timely. (*Id*.)

### c.   Defendant's Reply

In response, Defendant maintains that all Plaintiff's claims based upon alleged events occurring prior to November 2017 are time-barred under both Title VII and the LEDL. (Doc. 19 at 4.) Defendant reiterates that the only adverse employment action that occurred within 300 days prior to August 29, 2018 (Title VII claims) or November 2017 (LEDL claims) was Plaintiff's termination on July 20, 2018. (*Id*.)

Further, the continuing violation doctrine does not apply because: (1) the last date specific complaint of discrimination was in 2015 and (2) his other allegations are not date specific or are unsupported by the record, except for events purportedly occurring in "late 2009 or early 2010." (*Id*. at 4–5 (citing Santos Dec., Doc. 14-2 at ¶¶ 3–8, 36–37).)

### 3. Analysis

#### a.   Prescription

Preliminary, the Court agrees with Defendant—many of Plaintiff's Title VII and LEDL claims are time-barred.  Again, under Title VII, a plaintiff must file an EEOC charge within 300 days from the date the unlawful employment practice complained about occurred. 42 U.S.C. § 2000e-5(e)(1). Here, Plaintiff filed his EEOC charge on August 29, 2018. (*See Compl.*, Doc. 1 at 2.)  Thus, any act of discrimination occurring before November 2, 2017, (300 days before his EEOC charge was filed) is time-barred under Title VII.  This is all of Defendant's alleged misconduct, other than the July 17, 2018 suspension and the July 20, 2018 termination.

As to Plaintiff's LEDL claims, all acts occurring before August 29, 2017 are time-barred. Again, Plaintiff allegedly filed his EEOC complaint on August 29, 2018 (*Compl.*, Doc. 1 at 2), and

he filed suit on December 24, 2018 (*id.* at 12).  The time between these two dates (which does not exceed six months) is excluded.  *See* La. R.S. 23:303(D).  Thus, all acts occurring before August 29, 2017 (one year before the EEOC charge was filed), which is, again, essentially all acts other than his suspension and termination are time-barred under the LEDL.

### b.  Continuing Violation Doctrine

Plaintiff argues that his claims are saved by the continuing violation doctrine. He maintains that his suspension and termination keep his other claims from having prescribed.   But this argument fails.

The Fifth Circuit has held that the continuing violations doctrine does not apply to claims of retaliation because "retaliation is, by definition, a discrete act, not a pattern of behavior." *See Hamic v. Harris Cnty., W.C. & I.D. No. 36*, 184 F. App'x 442, 447 (5th Cir. 2006); *Heath v. Bd. of Sup'rs for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 741 (5th Cir. 2017), *as revised* (Mar. 13, 2017). Plaintiff argues that these cases do not apply because: (1) his job change to Meter Changer was not a discrete act, but instead was a continuing violation "comparable to repeated failures to promote," and (2) his "termination was the culmination of a series of continuing violations with respect Plaintiff's placement into a position with no promotion potential." (Doc. 14 at 18–19.) However, the Court rejects these arguments.

Notably, Plaintiff fails to cite any legal authority in support of his position. He also fails to consider that "retaliation is, by definition, a discrete act, not a pattern of behavior." *Hamic*, 184 F. App'x at 447. Additionally, courts have held that repeated failures to promote are discrete acts to which the continuing tort doctrine does not apply.  *Aggarwal v. New York City Health and Hosp. Corp.*, No. 98-5063, 2000 WL 172787, at *4 (S.D.N.Y. Feb 10, 2000) ("Courts have consistently held that discrete or completed acts, including repeated failures to promote an employee, do not

constitute a continuing violation."). Further, it is well established that termination is a single act, discrete in nature, not a continuation of any other act. *See Nat'l R.R.,* 536 U.S. at 114.

Plaintiff likewise fails to show the continuing violation doctrine applies to his untimely discrimination claims. Again, "discrete adverse actions, although racially motivated, cannot be lumped together with the day-to-day pattern of racial harassment and therefore, if otherwise untimely, cannot be saved by the continuing violation doctrine." *Boyd*, 2015 WL 3969464, at *2; *see also Pegram*, 361 F.3d at 280. As explained above, Plaintiff's 2018 termination and 2010 job change are discrete discriminatory acts, which are not continuing in nature. Plaintiff's 2014 reprimand is also a discrete act to which the continuing violation doctrine does not apply. *See Tillman v. S. Wood Preserving of Hattiesburg, Inc.,* 377 F. App'x 346, 349 (5th Cir. 2010) ("The Supreme Court has defined 'discrete acts' as easily identifiable incidents, including termination, failure to promote, denial of transfer, and refusal to hire. Under this standard, the April 12, 2005 reprimand, the alleged June 2005 pay-raise exclusion, and the denials of weekend overtime qualify as such discrete acts."). Thus, there was no continuing violation.

Based on the foregoing, the Court finds that Plaintiff has failed to satisfy his burden of showing that the continuing violation doctrine is applicable to his retaliation and discrimination claims. Accordingly, the Court turns to Plaintiff's 2018 termination and suspension for his Title VII and LEDL claims.

### C. Discrimination

#### 1. General Law

Title VII prohibits discrimination by employers "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Intentional discrimination under

Title VII can be proven by either direct or circumstantial evidence. *Laxton v. Gap, Inc.,* 333 F.3d 572, 578 (5th Cir. 2003); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). For evidence to be "direct," it must, if credible, prove the fact in question without inference or presumption. *Fabela v. Socorro Indep. Sch. Dist.,* 329 F.3d 409, 415 (5th Cir. 2003) (citations omitted). Here, Plaintiff has not presented any direct evidence of discrimination. Accordingly, the Court shall employ the familiar burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

To overcome a motion for summary judgment on his remaining discrimination claims, Plaintiff must first establish, by a preponderance of the evidence, a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 801–803. A prima facie case is established once the plaintiff has proven that he: (1) is a member of a protected class; (2) was qualified for his position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class; or in the case of disparate treatment, show that others similarly situated were treated more favorably. *Id.*; *see also Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005). The prima facie case, once established, raises a presumption of discrimination, which the defendant must rebut by articulating a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802; *Meinecke v. H & R Block*, 66 F.3d 77, 83 (5th Cir. 1995) (citing *Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

If the defendant satisfies this burden by proffering a non-discriminatory reason for the adverse employment action, the plaintiff must then create a genuine issue of material fact that either: (1) the defendant's reason is not true, but instead is a pretext for discrimination (pretext

alternative); or (2) regardless of the nondiscriminatory reason, the plaintiff's race was also a motivating factor (mixed-motives alternative). *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (citation omitted); *Rachid v. Jack In The Box, Inc*., 376 F.3d 305, 312 (5th Cir. 2004). Plaintiff proceeds under a pretext theory in this case.

Once a Title VII case reaches the pretext stage of the analysis, the only question remaining is whether there is a conflict in substantial evidence to create a question for the factfinder. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999) (citing *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir. 1996) (noting that once a Title VII case reaches the pretext stage, the sufficiency of the evidence test is applied)). Throughout, the ultimate burden of persuasion remains with the plaintiff. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

The same requirements apply to Plaintiff's claims under La. R.S. 23:301 *et seq.* "Louisiana state courts routinely look to federal jurisprudence, including Title VII, to interpret Louisiana's anti-discrimination laws." *Minnis v. Bd. of Sup'rs of Louisiana State Univ. & Agric. & Mech. Coll.*, 55 F. Supp. 3d 864, 884–85 (M.D. La. 2014) (citing *Wyerick v. Bayou Steel Corp.*, 887 F.2d 1271, 1274 (5th Cir. 1989); *Smith v. Amedisys, Inc.*, 298 F.3d 434, 448 (5th Cir. 2002)). Therefore, the analysis applicable to Plaintiff's Title VII claims also governs his state law claims.

### 2. Comparators

#### a. Parties Arguments

##### i. Defendant's Memorandum

Defendant argues that Plaintiff cannot establish a prima facie case for discrimination because he has failed to identify any "comparator." (Doc. 12-7 at 10.) It then proffers two comparators who both are from El Salvador, were hired in 2012 (after Plaintiff), were assisted by

BRWC in obtaining their CDLs, were promoted to Utility Worker 2 and Utility Worker 3, and were both still employed by BRWC after Plaintiff was terminated in 2018. (*Id*.) From this, Defendant reasons that the existence and work experiences of the two proffered comparators "totally negate(s) any inference of national origin discrimination on the part of BRWC." (*Id*.)

### ii.    Plaintiff's Opposition

In opposition, Plaintiff first avers that he has satisfied the comparator requirement because he alleges in his Complaint that "[he] was treated less favorably than his fellow non-Salvadoran workers." (Doc. 14 at 12 (citing *Compl.* ¶¶ 22–36).) He then argues that no identical comparator exists because BRWC created a position solely for him that had no promotional potential. (*Id*.) Despite this, Defendant should not be allowed to benefit from their own discriminatory practices. (*Id*.)

Next, Plaintiff points to his own declaration in which he identifies five additional comparators. (*Id*.) Plaintiff argues that these individuals were treated more favorably than him with respect to (1) BRWC assisting them in obtaining their CDLs and (2) discipline imposed by BRWC after being involved in similar and/or more egregious incidents. (*Id*. at 12–13 (citing Santos Dec., ¶¶ 12–13, 29, 43).)

Lastly, Plaintiff contends that BRWC's proffered comparators do not "totally negate[] any inference of national origin discrimination" because there is no mention of the comparators' accents, only their national origin. (*Id*. at 13 (citing Doc. 12-7 at 10).) According to Plaintiff, there is no evidence that BRWC's comparators made complaints about discrimination like he did. (*Id*.) "Therefore, BRWC's comparators do not and cannot account for the accent discrimination that Mr. Santos was subjected to and, therefore, lend no support to BRWC's motion." (*Id*.)

### iii.    Defendant's Reply

In response, Defendant argues that Plaintiff's proffered comparators are not similarly situated:

> BR Water's stated reason for terminating Santos was due to his failure to report the damage to his supervisor, his denial of damage to the Customer's gate, his refusal to admit that he had done anything wrong, and his indication that he would not do anything differently if it happened again (Affidavit of Mire, no. 20; Deposition of Mire, pp. 77-98 and Exhibits 15 and 5). There is no evidence that Plaintiff's proffered "comparators" were similarly unrepentant and insubordinate, and, thus, they are not similarly situated.
>
> With respect to the El Salvadoran comparators identified by BR Water, Plaintiff implies that they are not similarly situated due to their (lack of) accents, as compared to Plaintiff. There is no evidence of this in the Record, and it would be Plaintiff's burden to produce such evidence. Further, BR Water assisted both these El Salvadorans in obtaining their CDL's, which argues strongly against Plaintiff's complaint that he was denied assistance (in this regard) due to his national origin.

(Doc. 19 at 6 n.1.)

BRWC also claims that national origin played no role in its decision to assist (or not assist) its employees in obtaining their CDLs because it assisted both El Salvadoran and non-El Salvadoran employees. (*Id*. at 6–7.) Further, Plaintiff conceded that he made no effort to obtain his CDL and did not request BRWC's assistance in obtaining it after his transfer in 2010, which renders the issue of non-assistance time barred. (*Id*. at 7.)

### b.    Analysis

Defendant concedes that Plaintiff is: (1) is a member of a protected class; (2) was qualified for his position; and (3) was subjected to an adverse employment action when he was terminated. However, Plaintiff has failed to satisfy prong four in that he has failed to identify a proper comparator—someone "similarly situated" who was "treated more favorably." *Septimus*, 399 F.3d at 609.  The law is clear that, "[i]n the context of a race [or national origin] discrimination claim where the plaintiff alleges that employees who were not members of the protected class received

more [favorable treatment], the plaintiff must come forward with *specific evidence* of comparators who were similarly situated." *Corley v. Louisiana ex rel. Div. of Admin., Office of Risk Mgmt*, 816 F. Supp. 2d 297, 316 (M.D. La. 2011) (citing *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009)) (emphasis added). Courts within the Fifth Circuit define "similarly situated" narrowly. *See Horton v. G4S Secure Solutions (USA), Inc.*, No. 16-544, 2018 WL 1997535 at *5 (M.D. La Apr. 27, 2018) (citing *Brown v. Bd. of Trustees Sealy Indep. Sch. Dist.*, 871 F. Supp. 2d 581, 593 (S.D. Tex. 2012); *see also Lopez v. Kempthorne,* 684 F. Supp. 2d 827, 856–57 (S.D. Tex. 2010)).

In *Lee*, the Fifth Circuit explained the appropriate standard to apply in evaluating this element:

> "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been "nearly identical" to that of the proffered comparator who allegedly drew dissimilar employment decisions. If the "difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer," the employees are not similarly situated for the purposes of an employment discrimination analysis.

*Lee*, 574 F.3d at 260–61 (emphasis in original)

Several cases have applied this standard to find that comparators were not sufficiently similar to satisfy the prima facie burden. *See, e.g., Glaskox v. Harris Cty., Tex.*, 537 F. App'x 525 (5th Cir. 2013); *Reyna v. Donley*, 479 F. App'x 609 (5th Cir. 2012).

Having considered these cases, the Court finds that Plaintiff has failed to establish his prima facie case. Plaintiff's summary judgment evidence refers generally to five non-El Salvadorian employees: (1) Kenneth Seale, (2) Chad Phelps, (3) Jeffery McCauley, (4) MacArthur Allen, and (5) Zachary Sholty. However, Plaintiff gives virtually no other details about these employees, so

the Court cannot determine whether they qualify as comparators under the Fifth Circuit's "nearly identical" test.

Of the five non-El Salvadorian employees Plaintiff proffers as comparators, only Allen and Sholty were involved incidents where they backed their company vehicle into property. Plaintiff states in his declaration that these incidents are "very similar to [his]" and that neither employee was terminated after the incident. (Santos Dec., Doc. 14-2 at ¶ 43.) As to Sholty, this conclusory allegation is the only information Plaintiff provides. Thus, Plaintiff failed to present competent summary judgment evidence that Sholty is a similarly situated comparator.

As to Allen, photos of the damage to Allen's work truck were produced as well as his incident report and testimony by Mire. (Doc. 12-3 at 65–67, BRWC_00654.) As to the circumstances of Allen's accident, Mire testified:

> I can't remember if it was a school or some sort of business, could have been a school, that one of our trucks had backed into their card reader and they had it on film. And they wanted their card reader repaired. So, we asked for the film. Looked at the film, could determine what truck it was and that it was his, and he was, in fact, driving that vehicle at the time.
>
> So, we called him in, and he stated he was completely unaware that it had happened, and he was horrified that it had happened and he was very sorry. So, he was suspended for that. And we actually went to go fix the card reader, but it ended up not being broken. So that' s my recollection

(Mire Dep., Doc. 12-2 at 117–118.)

She further stated that although Allen "did not report the accident," he was "very remorseful and understood… what a difficult position he put the company in." (Mire Dep., Doc. 12-2 at 119.)

Based on the above, there is no evidence that Allen was similarly as unaccepting of responsibility as Plaintiff was. In fact, Mire's testimony demonstrates the contrary. (Mire Dep., Doc. 12-2 at 117–118.) Additionally, Allen's suspension document supports this. It provides:

On June 25, 2019, the company received a complaint regarding one of our vehicles backing into a card reader machine at the caller's place of business. After an investigation was completed, it was determined that you had backed into the machine on June 10, 2019. When your manager discussed this with you, you apologized and advised that you were unaware that you had hit the machine. You stated your understanding of the need to be more aware of your surroundings and vehicle condition during your walk-around.

(Doc. 15-9 at 6, BRWC_00656.)

Further, there is insufficient evidence to determine if Allen had the same job title, supervisor, or violation history. Accordingly, there is no showing that Allen is similarly situated to Plaintiff.

Of the remaining three individuals, Seale is the only one who had the same job title as Plaintiff. In his declaration, Plaintiff states that at the time he was moved to Meter Changer, Seale was a Utility Worker who "had the same or nearly identical job responsibilities, experience, and qualifications" as he did. (Santos Dec., Doc. 14-2 at ¶ 12.) Plaintiff notes that "Seale was involved in an incident more serious than [Plaintiff's] and was not terminated." (Santos Dec., ¶ 13.) Again, Plaintiff fails to provide any information about the incident Seale was involved in, much less enough information to determine if the incident was "nearly identical" to the one Plaintiff was involved in. There is also no evidence regarding Seale's violation history or whether he and Plaintiff shared a supervisor. As such, there is no evidence that Seale is a similarly situated comparator.

Likewise, Plaintiff has not shown that Phelps and McCauley were similarly situated to him. As to these individuals, Plaintiff claims that they were scheduled to take the CDL test the same day as he was. (Santos Dec., Doc. 14-2 at ¶ 29; Doc. 14-2 at 9, BRWC_00843.) However, he contends that unlike these individuals, he was never informed he was scheduled to take the test due to discrimination. (Santos Dec., ¶ 30.)  He declares: "Because I believe BRWC assisted these

individuals in obtaining their CDLs, I think they were treated more favorably than me." (*Id*. at ¶ 29.)

Importantly, as discussed above, the issue of whether BRWC discriminated against Plaintiff in allegedly not offering him assistance in obtaining his CDL is time barred. Even putting prescription issues aside, Plaintiff gives no other information about these individuals. Thus, Plaintiff has failed to show that Phelps and McCauley are similarly situated to him.

Additionally, to the extent Plaintiff alleges accent discrimination, the burden is on Plaintiff to produce evidence that others without an accent were treated more favorably than him. *Lee*, 574 F.3d at 260–61. He failed to do so here.

In sum, Plaintiff failed to create a genuine issue of material fact that other similarly situated employees were treated more favorably than he was because he fails to provide any information about:

1. whether they "shared the same job or responsibilities" (that is, did they serve in the same department?) [except for Seale who was a Utility Worker]

2. whether they "reported to the same supervisor" (indeed, Plaintiff provides no evidence related to who any of the employees reported to);

3. whether their violation histories were the same as the Plaintiff's; and

4. the "critical" factor of whether the "conduct that drew the adverse employment decision was nearly identical."

Consequently, Plaintiff has failed to establish a prima facie case of national origin or accent discrimination.  Although the Court need not go further, the Court also finds that, even if Plaintiff could establish a prima facie case of discrimination, he has failed to overcome Defendant's legitimate, nondiscriminatory reasons for his termination with pretext evidence suggestive of national origin or accent discrimination.

35

### 3. Legitimate, Non-discriminatory Reasons for Termination

#### a. Parties' Arguments

BRWC's articulated reasons for Plaintiff's termination are: (1) his failure to report the damage to a company vehicle to his supervisor, (2) his denial of damage to the customer's gate, (3) his refusal to admit that he had done anything wrong, and (4) his indication that he would not do anything differently if it happened again in the future. (Doc. 19 at 6.) BRWC stresses that Plaintiff was not terminated for his involvement in an accident and damage to a company vehicle nor due to his national origin or accent, but only for the reasons listed above. (*Id*. at 4.)

#### b. Analysis

BRWC has presented legitimate, non-discriminatory reasons for terminating Plaintiff. Defendant argues it fired Plaintiff because he refused to admit that he did anything wrong and for his refusal to accept responsibility for his actions, which constitutes insubordination and is a legitimate rationale for termination. *Fullen v. City of Columbus,* 514 F. App'x 601, 606 (6th Cir. 2013) (citing *Russell v. Univ. of Toledo,* 537 F.3d 596, 604 (6th Cir. 2008); *Hibbler v. Reg'l Med. Ctr. at Memphis,* 12 F. App'x at 340 (6th Cir. 2001) (holding that "documented insubordination constitutes a legitimate nondiscriminatory reason for ...firing.")).

Defendants have introduced evidence to demonstrate Plaintiff was fired for his insubordination. Specifically, Mire testified that although the incident leading up to his termination "stemmed from an accident," Plaintiff "ultimately" was terminated for refusing to accept responsibility and his indication "that he would [not] change his behavior in the future." (Mire Dep., Doc. 12-2 at 77.)

Mire further testified that Plaintiff was suspended while they tried to figure out how they could keep him. (*Id*.) Mire stated that she hoped Plaintiff would "admit his wrongdoing, apologize,

and take responsibility for his actions, but instead [she] got, 'I don't understand why you think I did anything wrong. I didn't do anything wrong. The gate wasn't damaged. All I did was break a taillight.' " (Mire Dep., Doc. 12-2 at 80.)

Plaintiff's termination documents also demonstrate his insubordination:

On Tuesday, July 17, 2018, the Fleet Manager gave an update to your department head concerning one of the meter department vehicle's damage, about which your supervisor had no knowledge. It was determined that on Friday, July 13, 2018, you had hit a customer's gate, damaging it and the company vehicle. However, you did not contact your supervisor, the customer, or the police to report the incident. After you finished your work day, you brought the vehicle to a company mechanic to ask that he repair the tail light, even though the damage was significantly more than the tail light.

Despite having your supervisor's contact information that you had used many times before, **and against company policy,** you never notified your supervisor at the time of the accident and through the following Tuesday. This caused the company not to be able to contact the customer to repair the damage, obtain information needed to determine the extent of the company's liability, or to take a timely post-accident drug test.

**When you were asked about the incident by your supervisor on Tuesday, you stated that there was no damage to the customer's property. You remained steadfast in your disagreement that there should be concerns with your actions during discussions with your supervisor and manager regarding the incident.**

**It is imperative that the company by able to trust its employees to appreciate the seriousness of an accident and the importance of reporting accidents to their supervisor timely, especially those involving damage to property. Further, it was determined that you provided false or misleading information during the investigation. Your actions are considered unacceptable and cannot be tolerated.**

Be advised that your employment is terminated.

(Doc. 12-3 at 62–63, 95–96 (emphasis added).)

A violation of a company policy is also a legitimate, non-discriminatory reason for termination. *See Clark v. RailCrew Xpress, LLC,* No. 16-585, 2018 WL 5269365, at *9 (M.D. La. Oct. 23, 2018) (finding that the record reflected that the employer's decision to terminate the

plaintiff based on violations of company policy comported with the company's employee manual and thus was a legitimate, non-discriminatory reason for termination.); *Thomas v. Aventis Pharm., Inc.*, 177 F. App'x 54, 56 (11th Cir. 2006) (suggesting that work rule violations were legitimate, non-discriminatory reasons for terminating an employee); *Foster v. Mid State Land & Timber Co., Inc.*, 2007 WL 3287345, at *12 (M.D. Ala. Nov. 5, 2007) ("[V]iolations of work rules constitute legitimate, nondiscriminatory reasons for terminating an employee."); *Thomas v. Ala. Council on Human Relations, Inc.*, 248 F. Supp. 2d 1105, 1121 (M.D. Ala. 2003) (noting that violations of work rules provided a legitimate, nondiscriminatory reason for a discharge); *see also Arismendiz v. Univ. of Tex. at El Paso*, 536 F. Supp. 2d 710, 717 (W.D. Tex. 2008) (noting that "the violation of work rules is a legitimate, non-discriminatory reason for an adverse employment action").

Defendant has produced admissible evidence that Plaintiff's violation of BRWC's company policy was also a reason for his termination. The company policy provision Plaintiff allegedly violated states in relevant part: "in the event of an accident with another vehicle" or "in case of an accident involving property damage," employees are expected to follow these steps: […]

- Notify your supervisor and the Human Resources Department about the accident as soon as possible.

(Doc. 12-3 at 51–52.)

When Plaintiff was asked if he reported the damage to his company vehicle to his supervisors (Wilkinson or Pourciau), Plaintiff stated "no." (Santos Dep., Doc. 16-2 at 92.)

Again, BRWC's burden is only one of production, not persuasion, and involves no credibility assessment. *Russell,* 235 F.3d at 222. Accordingly, the Court finds that Defendant has submitted summary judgment evidence of legitimate, non-discriminatory reasons for terminating Plaintiff.

The Court now turns to Plaintiff's contention that these reasons were a pretext for national origin and accent discrimination.

### 4. Pretext

#### a. Parties' Arguments

Plaintiff argues that the following constitute evidence of pretext:  (1) BRWC's claim that he did not report the damage he caused to a company vehicle is wrong because he did report it; (2) BRWC's claim that he failed to report damage he caused to a customer's gate is wrong because he was unaware of any alleged damage; (3) BRWC's claim that he was required to report the incident to his supervisor in accordance with company is wrong because (a) he did report it to his supervisor, (b) the company policy did not require that the incident be reported, and (c) BRWC failed to present evidence that he was presented the company policy he allegedly violated. (Doc. 14 at 14–15.)

Further, Plaintiff contends that summary judgment is especially inappropriate here given the parties' significantly different version of events. (*Id*. at 16 (citing *Heinsohn v. Carabin & Shaw, P.C*., No. 15-50300, 2016 U.S. App. LEXIS 13613, at *44 (5th Cir. 2016) ("[b]y choosing which testimony to credit and which to discard, '[a] court improperly 'weigh[s] the evidence' and resolve[s] disputed issues in favor of the moving party.'")).)

In response, Defendant avers that the differences in the version of events largely relate to events that occurred prior to 2017, which are time barred and not "material" for purposes of the instant motion. (Doc. 19 at 4.)  Additionally, "Differences with respect to the extent of damage to the Company vehicle or customer property, in connection to Plaintiff's termination in July 2018 are also immaterial." (*Id*.)

### b.  Analysis

Plaintiff presents several arguments challenging the veracity or the legitimacy of BRWC's proffered reasons for his termination and claims that these reasons are a pretext for discrimination. The Court finds that even if Plaintiff had presented a prima facie case of discrimination, Plaintiff has failed to create a genuine issue of material fact that Defendant's reasons are not true, but instead are a pretext for discrimination.

The Court finds that Plaintiff failed to carry his burden because he has failed to present evidence rebutting each of the nondiscriminatory reasons offered by Defendant for his termination. Although Plaintiff has submitted evidence to create a question of material fact as to whether he received the company policy provision he allegedly violated,[7] he has failed to provide any evidence to rebut BRWC's other reason for his termination—his insubordination in refusing to admit he did anything wrong and that he would not do anything differently in the future.

The Fifth Circuit requires that a plaintiff present evidence rebutting each of the nondiscriminatory reasons offered by the employer. *Williams v. Clegg's Nursery,* 2016 WL 3702978, at *9 (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)). "Where a plaintiff 'falls short of [his] burden of presenting evidence rebutting each of the legitimate, nondiscriminatory reasons produced by [the employer],' summary judgment is appropriate." *Id.* (quoting *Jackson v. Watkins*, 619 F.3d 463, 467 (5th Cir. 2010) (emphasis in original)). Accordingly, Plaintiff's failure to present controverting evidence to rebut BRWC's reason for firing him based on his insubordinate behavior, renders summary judgment appropriate in favor of Defendant.

---

[7] Again, Plaintiff contends that he was never provided with the company policy that he allegedly violated nor did BRWC provide any evidence that he received the policy. (Santos Dec., Doc. 14-2 at ¶ 56; Mire Dep., Doc. 17-1 at 129–131; *AUMF* ¶ 25.)

Furthermore, whether the Court views BRWC's findings and decisions as to Plaintiff incorrect is not the question.  The only question before the Court is whether the findings and decisions were motivated by Plaintiff's national origin or accent.  The Fifth Circuit cautions that courts are not in the business of second-guessing business judgments, and the Court declines to do so here. *Clark,* 2018 WL 5269365, at *13; *Walton v. Bisco Indus. Inc.,* 119 F.3d 368, 372 (5th Cir. 1997).

The analysis applicable to Plaintiff's Title VII claims also governs his state law claims. *Williams*, 2016 WL 3702978, at *15; *Minnis*, 55 F. Supp. 3d at 884-85. Therefore, summary judgment is granted as to Plaintiff's LEDL claims on the same grounds as described above.

Additionally, the Court declines to apply the same actor presumption because, even without it, BRWC has established non-discriminatory, legitimate reasons for Plaintiff's termination. The "same actor" inference creates a rebuttable presumption that an adverse action imposed on a plaintiff was not the result of unlawful discrimination when the same person both hires and fires, or imposes some other adverse action on, the plaintiff. *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 658 (5th Cir. 1996) (*abrogated in part on other grounds Russell v. McKinney Hosp. Venture,* 235 F.3d 219 (5th Cir. 2000)); *Trevino v. City of Fort Worth,* 2013 WL 4516643, at *7 (N.D. Tex. Aug. 23, 2013). "[T]he inference is not automatic" when it is not uncontested that the same person hired and took adverse action against the employee. *Russell,* 235 F.3d at 229 n.16 (stating that it was up to the jury to consider the evidence before it regarding application of the same actor inference, where defendant asserted that the same person hired and fired the plaintiff, while plaintiff presented evidence that she did a courtesy interview with, but was not hired by, the individual who fired her). The Court acknowledges that there is a material dispute as to who fired Plaintiff but declines to resolve it.

V.    **Conclusion**

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment* (Doc. 12) filed by Defendant The Baton Rouge Water Works Company is **GRANTED IN PART** and **DENIED IN PART**.

It is **GRANTED** in that Plaintiff's Title VII and LEDL discrimination claims against Defendant are **DISMISSED WITH PREJUDICE**.

It is **DENIED WITHOUT PREJUDICE** as to Plaintiff's Title VII and LEDL hostile work environment claims.

It is **DENIED WITHOUT PREJUDICE** as to Plaintiff's Title VII and LEDL retaliation claims, but it is **GRANTED WITH PREJUDICE** to the extent that these claims are premised upon time-barred events occurring before Plaintiff's 2018 suspension and termination.

Defendant may, within 30 days, file another motion for summary judgment addressing these remaining claims.

Signed in Baton Rouge, Louisiana, on March 31, 2021.


_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**